IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SAUNJULA STATON | ) | CASE NO. |
| 6432 Oak Point Estates | ) | |
| Lorain, Ohio 44053 | ) | JUDGE: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | **AND REINSTATEMENT** |
| CLEVELAND STATE UNIVERSITY | ) | |
| 2121 Euclid Avenue, AC 327 | ) | **JURY DEMAND ENDORSED** |
| Cleveland, OH 44115 | ) | **HEREIN** |
| | ) | |
| -and- | ) | |
| | ) | |
| DAVID PRATT | ) | |
| c/o Cleveland State University | ) | |
| 2121 Euclid Avenue, AC 327 | ) | |
| Cleveland, OH 44115 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| ERIKA JARRETT | ) | |
| c/o Cleveland State University | ) | |
| 2121 Euclid Avenue, AC 327 | ) | |
| Cleveland, OH 44115 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| JULIE REHM | ) | |
| c/o Cleveland State University | ) | |
| 2121 Euclid Avenue, AC 327 | ) | |
| Cleveland, OH 44115 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| DANIELLE RUIZ | ) | |
| c/o Cleveland State University | ) | |
| 2121 Euclid Avenue, AC 327 | ) | |
| Cleveland, OH 44115 | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Saunjula Staton, by and through undersigned counsel, as her Complaint against the Defendants, states and avers the following:

## PARTIES

1.   Staton is a resident of the city of Lorain, county of Lorain, state of Ohio.

2.   Cleveland State University ("CSU") is a state institution of higher learning as defined by Chapter 3345 of the Ohio Revised Code.

3.   CSU's main offices are located at 2121 Euclid Avenue, Cleveland, Ohio 44115.

4.   CSU was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. § 2000e *et seq*.

5.   CSU was at all times hereinafter mentioned an employer within the meaning of R.C. § 4112.01 *et seq*.

6.   David Pratt is a resident of the State of Ohio.

7.   Pratt was at all times hereinafter mentioned, the Associate Vice President of University Advancement at CSU.

8.   Pratt was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at CSU who acted directly or indirectly in the interest of CSU.

9.   As a manager and/or supervisor, Pratt had authority to discipline, hire, and fire employees of CSU.

10.   Pratt was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. § 2000e *et seq*.

11.   Pratt was at all times hereinafter mentioned an employer within the meaning of R.C. § 4112.01 *et seq*.

12.   Erika Jarrett is a resident of the State of Ohio.

2

13.   Jarrett was at all times hereinafter mentioned, a Human Resources Manager at CSU.

14.   Jarrett was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at CSU who acted directly or indirectly in the interest of CSU.

15.   As a manager and/or supervisor, Jarrett had authority to discipline, hire, and fire employees of CSU.

16.   Jarrett was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. § 2000e *et seq*.

17.   Jarrett was at all times hereinafter mentioned an employer within the meaning of R.C. § 4112.01 *et seq*.

18.   Julie Rehm is a resident of the State of Ohio.

19.   Rehm was at all times hereinafter mentioned, the Vice President of University Advancement at CSU.

20.   Rehm was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at CSU who acted directly or indirectly in the interest of CSU.

21.   As a manager and/or supervisor, Rehm had authority to discipline, hire, and fire employees of CSU.

22.   Rehm was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. § 2000e *et seq*.

23.   Rehm was at all times hereinafter mentioned an employer within the meaning of R.C. § 4112.01 *et seq*.

24.   Danielle Ruiz is a resident of the State of Ohio.

25.   Ruiz was at all times hereinafter mentioned, the Manager of Labor Relations at CSU.

26. Ruiz was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at CSU who acted directly or indirectly in the interest of CSU.

27. As a manager and/or supervisor, Ruiz had authority to discipline, hire, and fire employees of CSU.

28. Ruiz was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. § 2000e *et seq.*

29. Ruiz was at all times hereinafter mentioned an employer within the meaning of R.C. § 4112.01 *et seq.*

30. All material events alleged in this Complaint occurred in county of Cuyahoga.

## JURISDICTION & VENUE

31. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Staton is alleging a Federal Law Claim under the Civil Rights Act of 1964, 42 U.S.C. 2000e-2.

32. This Court has supplemental jurisdiction over Staton's state law claims pursuant to 28 U.S.C. § 1367 as Staton's state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

33. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

34. Within 300 days of the conduct alleged below, Staton filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge Nos. 532-2022-01660 against CSU, 532-2022-01663 against Jarrett, 532-2022-01664 against Pratt, 532-2022-01665 against Rehm, and 532-2022-01666 against Ruiz, all operating at 2121 Euclid Avenue, Cleveland, OH 44115.

35. On or about September 6, 2022, the EEOC issued and mailed Notice of Right to Sue letters to Staton regarding the Charges of Discrimination brought by Staton against each Defendant — Charge Nos. 532-2022-01660 against CSU, 532-2022-01663 against Jarrett, 532-2022-01664 against Pratt, 532-2022-01665 against Rehm, and 532-2022-01666 against Ruiz.

36. Staton received her Right to Sue letters from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1) - which have been attached hereto as Plaintiff's Exhibits A through E.

37. Staton has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letters.

38. Staton has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

39. Staton has properly exhausted her administrative remedies pursuant to R.C. § 4112.01 *et seq*.

## FACTS

40. Staton is a former employee of CSU.

41. Staton is African American.

42. In or around August 2015, CSU hired Staton as a Director of Advancement for the NEOMED and General University Funds. In or around August 2015, Staton was one of only two African American directors in fundraising for CSU out of approximately 10-12 directors.

43. Staton's job duties included fundraising on behalf of CSU to generate donations for various colleges and/or other fundraising priorities.

5

44. Throughout her employment with CSU, Staton was an exemplary employee with no meaningful discipline as a Director of Advancement.

45. While Staton was Director of Advancement for the NEOMED and General University Funds, she was instrumental in the development and implementation of several fundraising initiatives that are still being used at CSU.

46. In or around 2017, due to her track record of successful fundraising efforts, CSU selected Staton to make a lateral move to CSU's Athletics department ("Athletics") to help build their donor pipeline.

47. While fundraising for Athletics, Staton created a new Viking Fund program that resulted in a significant increase in donations for Athletics.

48. In or around 2018, Staton also helped to develop a new model for CSU's Annual Giving Day campaign, which is still being used by CSU to generate funds for its various schools.

49. In or around August 2019, despite her noteworthy fundraising efforts for Athletics, CSU's Athletics Director chose to bring in his own fundraising team for unknown reasons.

50. In or around August 2019, CSU moved Staton to a second lateral position as Director of Advancement for CSU's College of Sciences and Health Professions and CSU's School of Nursing.

**(Staton Begins to Experience Racial Discrimination in the Workplace)**

51. Upon information and belief, there is a well-documented history of significant racial disparity at CSU.

52. CSU had a pattern of treating non-African American employees more favorably than African American employees.

53. Throughout her tenure at CSU, Staton applied for several promotions for which she was well-qualified.

54. Despite Staton's fundraising successes prior to, and during her tenure at CSU, as well as her well-documented qualifications, CSU failed to hire Staton for any of the promotions for which she applied.

55. On every occasion where Staton applied for a promotion, Staton was passed over for a less-qualified, Caucasian employee.

56. Throughout her tenure at CSU, Staton was passed over for several promotions because of her race.

57. In or around August 2019, CSU moved Staton to the lateral position of Director of Advancement for the College of Sciences and Health Professions ("Sciences") and CSU's School of Nursing ("Nursing"). ("Staton's Second Lateral Position")

58. Staton's Second Lateral Position was located within CSU's Department of Advancement, which was responsible for most of the fundraising for CSU's individual colleges.

59. CSU's Department of Advancement was led by Vice President of Advancement, Julie Rehm, and Associate Vice President of Advancement, David Pratt.

60. Rehm is Caucasian.

61. Pratt is Caucasian.

62. Throughout the time she was employed in her Second Lateral Position, Staton was the only African American director within the Department of Advancement, which contained about 8 directors.

63. Throughout the time she was employed in her Second Lateral Position, Staton was the only director in the Department of Advancement that was assigned to fundraise for two colleges.

64. Fundraising for two colleges was significantly more difficult, because it required twice the amount of work, including the performance of all required administrative tasks.

65. Throughout the time she was employed in her Second Lateral Position, no non-African American directors were assigned to fundraise for two colleges.

66. CSU assigned Staton to fundraise for two colleges because of her race.

67. CSU assigned Staton to fundraise for two colleges to create a situation that would cause Staton to fail.

68. CSU's assignment of Staton to two colleges was discrimination because of Staton's race.

69. The person who previously performed Staton's Second Lateral Position was a Caucasian woman named Debbie Dey.

70. Dey performed the duties required of Staton's Second Lateral Position under the title of Senior Director of Advancement.

71. CSU gave Dey a promotion when she was assigned to perform the same duties required of Staton's Second Lateral Position.

72. CSU gave Dey a significant increase in pay when she was assigned to perform the same duties required of Staton's Second Lateral Position.

73. CSU gave Dey a dedicated assistant when she was assigned to perform the same duties required of Staton's Second Lateral Position.

74. Staton was not given a promotion to Senior Director of Advancement when she was reassigned to her Second Lateral Position.

75. Staton was not given a significant pay increase when she was reassigned to her Second Lateral Position.

76. Staton was not provided with a dedicated assistant when she was reassigned to her Second Lateral Position.

77. CSU did not provide Staton with a dedicated assistant to create a situation that would cause Staton to fail.

78. CSU did not give Staton a promotion to Senior Director of Advancement when she was assigned to her Second Lateral Position because of her race.

79. CSU did not give Staton a significant pay raise when she was assigned to her Second Lateral Position because of her race.

80. CSU did not provide Staton with a dedicated assistant when she was assigned to her Second Lateral Position because of her race.

81. CSU's failure to promote Staton to Senior Director of Advancement with her new position was discrimination because of Staton's race.

82. CSU's failure to give Staton a significant pay raise with her new position was discrimination because of Staton's race.

83. CSU's failure to provide Staton with a dedicated assistant in her new position was discrimination because of Staton's race.

84. Not only did CSU assign Staton to fundraise for two colleges, but CSU assigned Staton to the two colleges that had historically fundraised at a level that was lower than any of the other colleges.

85. Staton had been assigned to fundraise for the colleges of Sciences and Nursing.

86. The colleges of Sciences and Nursing have been identified in an independent consultant's assessment as the two CSU colleges that had the poorest fundraising abilities, requiring significant efforts to establish donor pipelines.

87.   CSU did not assign non-African American employees to fundraise for the two schools that had historically fundraised at the lowest level.

88.   CSU's assignment of Staton to fundraise for the two schools that had historically fundraised at the lowest level was because of her race.

89.   CSU's assignment of Staton to fundraise for the two schools that had historically fundraised at the lowest level was discrimination because of Staton's race.

90.   In or around December 2019, the assistant that performed Staton's administrative tasks left CSU for another position. ("Assistant's Departure")

91.   After the Assistant's Departure, Staton was forced to do all her own administrative tasks, significantly increasing her workload.

92.   The amount of additional work Staton now had to perform without an assistant was disproportionately excessive due to the fact Staton had to do this work for two colleges. ("Disproportionately Excessive Workload")

93.   Most other directors had an assistant to perform their administrative tasks, although they were only assigned to fundraise for one college.

94.   Because of the Disproportionately Excessive Workload, Staton began to ask Rehm when CSU would be hiring a new assistant.

95.   From December 2019 until the day CSU terminated Staton's employment, Defendants never provided Staton with a replacement assistant. ("Defendants' Failure to Provide Adequate Resources")

96.   Defendants' Failure to Provide Adequate Resources had a detrimental effect on the amount of work Staton was required to complete.

97.   Defendants' Failure to Provide Adequate Resources was designed by Defendants to create a situation that would cause Staton to fail.

98.   Staton was forced to work excessive hours to keep up with the Disproportionately Excessive Workload she had inherited after the Assistant's Departure.

99.   Defendants' Failure to Provide Adequate Resources did not cause a Disproportionately Excessive Workload for any of the non-African American directors.

100.  None of the non-African American directors were forced to work excessive hours to keep up with work due to Defendants' Failure to Provide Adequate Resources.

101.  Defendants' Failure to Provide Adequate Resources to Staton was because of her race.

102.  Defendants' Failure to Provide Adequate Resources to Staton was discrimination because of Staton's race.

103.  Defendants' Failure to Provide Adequate Resources was retaliation because Staton complained about disparate treatment.

104.  In or around March 2020, Defendants promoted one of Staton's coworkers to the position of Senior Director of Advancement for CSU's Law School without posting the job for applicants. ("Secret Law School Promotion")

105.  In or around March 2020, the person who received the Secret Law School Promotion was Caucasian.

106.  In or around March 2020, Staton questioned Rehm about the process used in the Secret Law School Promotion. ("Staton's Questions Regarding the Secret Law School Promotion")

107.  In or around March 2020, Staton was qualified to perform the duties of the Senior Director of Advancement for CSU's Law School.

108. Staton questioned why the position was never posted so that Staton would have a fair opportunity to apply.

109. Rehm was very dismissive of Staton's Questions Regarding the Secret Law School Promotion and refused to answer most of Staton's questions.

110. In or around March 2020, the Secret Law School Promotion was another example of CSU refusing to promote or even consider Staton for a position that she was more than qualified to perform.

111. Rehm circumvented the normal hiring process in her Secret Law School Promotion so she could prevent Staton from applying for the promotion.

112. Rehm prevented Staton from applying for the promotion because of her race.

113. The Secret Law School Promotion was discrimination because of Staton's race.

**(Staton Experiences More Discrimination Because of Her Race and CSU Retaliates)**

114. In or around April 2020, Staton applied for the position of Senior Director of Advancement for the College of Business. ("Senior Business Position")

115. The Senior Business Position was a promotion for Staton and a great opportunity for Staton to move forward in her career.

116. The Senior Business Position had a much higher potential for fundraising and paid a higher salary than Staton's salary.

117. Staton was met and exceeded the requisite qualifications for the Senior Business Position.

118. Despite Staton's qualifications, Defendants did not select Staton to even move past the phone-screening stage for the Senior Business Position. (Retaliatory Snub of Staton's Application for the Senior Business Position")

119.    The Retaliatory Snub of Staton's Application for the Senior Business Position was because of her race.

120.    The Retaliatory Snub of Staton's Application for the Senior Business Position was discrimination because of Staton's race.

121.    The Retaliatory Snub of Staton's Application for the Senior Business Position was less than a month after Staton had questioned Rehm about the Secret Law School Promotion.

122.    The Retaliatory Snub of Staton's Application for the Senior Business Position was in retaliation for Staton's questions to Rehm about the process Defendants used to select a new director for the Law School.

123.    In or around October 2020, Defendants selected a Caucasian woman for the Senior Business Position. ("New Senior Director of Business")

124.    The New Senior Director of Business was an external candidate with significantly less experience than Staton.

125.    Defendants failed to hire Staton for the Senior Business Position because of her race.

126.    Defendants' failure to hire Staton for the Senior Business Position was discrimination because of Staton's race.

127.    Defendants failed to hire Staton for the Senior Business Position in retaliation for Staton questioning Rehm about the Secret Law School Promotion.

128.    In or around August 2020, Rehm and Pratt established individual goals for Staton for the upcoming fiscal year without first meeting with Staton to gain her input. ("Unorthodox Establishment of Staton's Individual Goals")

129. The Unorthodox Establishment of Staton's Individual Goals was impractical because the process of establishing goals was normally made by gathering pertinent information from the individual director.

130. Rehm and Pratt established Staton's individual goals without knowledge of Staton's plans for the upcoming fiscal year.

131. Rehm and Pratt established Staton's individual goals without knowledge of the plans the dean for each of Staton's colleges had made for the upcoming fiscal year.

132. Rehm and Pratt established Staton's individual goals without knowledge of the Annual Fund Director's plans for the upcoming fiscal year.

133. Rehm and Pratt established Staton's individual goals without knowledge of any relevant plans anyone had made for either of her colleges for the upcoming fiscal year.

134. The Unorthodox Establishment of Staton's Individual Goals was detrimental to Staton's entire fundraising and development process because Staton was being held accountable for goals that were set arbitrarily.

135. The Unorthodox Establishment of Staton's Individual Goals was designed by Defendants to create a situation that would cause Staton to fail.

136. Beginning in or around August 2020, Staton made multiple attempts to meet with Rehm and Pratt to discuss her individual goals and potential issues with the numbers that had been established for Staton.

137. Beginning in or around August 2020, Rehm and Pratt repeatedly refused Staton's requests to meet to discuss her individual goals and the related potential issues.

138. Rehm and Pratt did not refuse requests to meet from non-African American directors.

139.   Rehm and Pratt did not refuse requests to meet from directors who had not questioned the Secret Law School Promotion.

140.   Rehm and Pratt did not refuse requests to meet from directors who had not complained about a Failure to Provide Adequate Resources.

141.   In or around August 2020 and for the remainder of her employment with CSU, Staton continued to ask Rehm and Pratt for the administrative support she needed to assist with the Disproportionately Excessive Workload she had inherited after her shared assistant left CSU in December 2019.

142.   In or around October 2020, Staton discovered the New Senior Business Director, Nicole Gibson, had been assigned to an existing development manager for assistance with all her administrative tasks.

143.   In or around October 2020, Rehm and Pratt immediately provided Gibson with the same administrative assistance that Staton had been requesting for nearly a year.

144.   Gibson, who is Caucasian, was only assigned to one college like all other directors except Staton.

145.   In or around October 2020, Staton again asked Rehm and Pratt about getting administrative assistance.

146.   In or around October 2020, Rehm and Pratt continued to ignore Staton's request for administrative assistance while providing the same to another one of Staton's Caucasian coworkers.

147.   Rehm and Pratt continued to ignore Staton's request for administrative assistance because of her race.

148.  Defendants' continued failure to provide Staton with administrative assistance was discrimination because of Staton's race.

149.  Defendants' continued failure to provide Staton with administrative assistance was retaliation because of her complaints.

150.  For the duration of Staton's employment with CSU, Rehm and Pratt refused to meet with Staton to discuss adjusting her individual goals and refused to honor her requests for much-needed administrative support. ("Defendants' Establishment of an Inconducive Work Environment for Staton")

151.  Defendants did not establish an inconducive work environment for non-African American directors.

152.  Defendants did not establish an inconducive work environment for directors that had not questioned the Secret Law School Promotion.

153.  Defendants did not establish an inconducive work environment for directors that had not complained about their individual goals.

154.  Defendants' Establishment of an Inconducive Work Environment for Staton was because of her race.

155.  Defendants' Establishment of an Inconducive Work Environment for Staton was discrimination because of Staton's race.

156.  Defendants' Establishment of an Inconducive Work Environment for Staton was retaliation for Staton's questioning the Secret Law School Promotion.

157.  Defendants' Establishment of an Inconducive Work Environment for Staton was retaliation for Staton's complaints about her individual goals.

158.   In or around December 2020, Staton met with Pratt for a regularly scheduled one-on-one meeting. ("Staton's December Meeting with Pratt")

159.   During Staton's December Meeting with Pratt, Staton again asked about getting an administrative assistant to help with her Disproportionately Excessive Workload.

160.   During Staton's December Meeting with Pratt, Pratt advised Staton she could have an administrative assistant when she brought in more money from donors. ("Pratt's Disparate Denial of Administrative Assistance")

161.   Pratt did not deny administrative assistance to any non-African American directors.

162.   Pratt did not deny administrative assistance to any director that had not questioned Rehm's Secret Law School Promotion.

163.   Pratt did not deny administrative assistance to any director that had not complained about their individual goals.

164.   Pratt's Disparate Denial of Administrative Assistance to Staton was because of her race.

165.   Pratt's Disparate Denial of Administrative Assistance to Staton was discrimination because of Staton's race.

166.   Pratt's Disparate Denial of Administrative Assistance to Staton was retaliation for Staton's questioning Rehm's Secret Law School Promotion.

167.   Pratt's Disparate Denial of Administrative Assistance to Staton was retaliation for Staton's complaints about her individual goals.

168.   In or around December 2020, Rachel Peres—Director of CSU's Annual Fund, sent out emails that were not addressed with individual donors' names to Staton's donors in the College of Sciences and Health Professions. ("Peres' Detrimental Mistake")

169. Peres' Detrimental Mistake was highly unprofessional and likely resulted in a significantly lower number of gifts being given from the group of affected donors.

170. In or around December 2020, Staton complained to Pratt about Peres' Detrimental Mistake. ("Staton's Complaint Regarding Peres' Detrimental Mistake")

171. Staton was deeply concerned about Peres' Detrimental Mistake because it directly affected Staton's fundraising prospects for the fiscal year.

172. Peres' Detrimental Mistake was very likely to dissuade many of Staton's potential donors from sending gifts to the college, because they had received a generic, non-personalized solicitation for donations.

173. Staton complained to Pratt about Peres' Detrimental Mistake because it undermined the already difficult individual fundraising goal that had been set for Staton in the College of Sciences and Health Professions.

174. Peres' Detrimental Mistake was a major error on a very important aspect of Peres' required duties.

175. Upon learning of Peres' Detrimental Mistake, Pratt failed to take prompt remedial action regarding Peres' Mistake.

176. Upon information and belief, Pratt did not take any disciplinary action toward Peres regarding her Detrimental Mistake.

177. Upon information and belief, Pratt did not issue any verbal warning to Peres regarding her Detrimental Mistake.

178. Upon information and belief, Pratt did not issue any written warning to Peres regarding her Detrimental Mistake.

179. Upon information and belief, Pratt did not issue any suspension to Peres regarding her Detrimental Mistake.

180. Upon information and belief, Pratt did not terminate Peres' employment due to her Detrimental Mistake.

181. Despite Peres' Detrimental Mistake severely impacting Staton's ability to fundraise in the College of Sciences and Health Professions, Pratt refused to make appropriate adjustments to Staton's individual goals for the college.

182. Pratt's refusal to adjust Staton's individual goals for the college made Staton solely responsible for making up the difference in the loss of potential donations that Peres' Detrimental Mistake had caused.

183. In or around January 2021, Pratt began to question Staton as to why her attainment numbers for the College of Sciences and Health Professions was lower than expected. ("Pratt's Discriminatory Scrutiny of Staton's Numbers")

184. Pratt's Discriminatory Scrutiny of Staton's Numbers came shortly after Staton complained about Peres' Detrimental Mistake, so she was confused as to why he did not make the connection between the two events.

185. In or around January 2021, Pratt addressed Staton about her numbers less than a month after Peres' Detrimental Mistake had caused Staton to lose some of her potential donors for the college.

186. In or around January 2021, Staton complained to Pratt that his scrutiny of her numbers was discriminatory and unfair, given the recent occurrence of Peres' Detrimental Mistake and several other external issues that were outside of her control, such as the unrealistic goals that had been set and the lack of administrative assistance.

187. In or around January 2021, Staton voiced her concerns to Pratt about the disparate treatment she had been experiencing. ("Staton's First Complaint of Racial Discrimination")

188. After Staton's First Complaint of Racial Discrimination, Pratt became increasingly focused on finding fault with Staton's numbers, despite her well-documented efforts to perform her job and to attain donations.

189. On or around January 14, 2021, Pratt scheduled a Zoom meeting with Staton and himself. ("January 14th Zoom Meeting")

190. During the January 14th Zoom Meeting, Staton discovered that she and Pratt were going to be joined by HR Manager, Erika Jarrett.

191. During the January 14th Zoom Meeting, Pratt expressed his concern about Staton's performance as compared to the other directors.

192. During the January 14th Zoom Meeting, Staton was surprised to hear that Pratt was concerned about her performance, because they had regular one-on-one meetings, and this was never addressed before that day.

193. During the January 14th Zoom Meeting, Staton advised Pratt he had never expressed an issue with her performance, and that Pratt was aware of the many obstacles Staton faced.

194. Staton advised Pratt his concern about her performance was premature.

195. Staton advised Pratt his concern about her performance was discriminatory and unfair for several reasons.

196. Pratt's concern about Staton's performance was discriminatory and unfair because Staton had not been in her role long enough to properly cultivate major gift donations.

197. Pratt's concern about Staton's performance was discriminatory and unfair because Staton had been in her role for less than six months when attempts to establish two donor pipelines were severely impeded by the COVID-19 pandemic.

198. Pratt's concern about Staton's performance was discriminatory and unfair because Staton's performance was being compared to directors who had each been in their roles for three or more years and who were only assigned to one college.

199. Pratt's concern about Staton's performance was discriminatory and unfair because each of the other directors was assigned to a school that had an established pipeline of donations.

200. Pratt's concern about Staton's performance was discriminatory and unfair because Pratt was aware of the problems that Peres' Detrimental Mistake had caused for the donations to one of her colleges.

201. Pratt's concern about Staton's performance was discriminatory and unfair because Staton had been assigned to the two colleges that were known to historically fundraise at a level that was much lower than any of the other colleges.

202. Pratt's concern about Staton's performance was discriminatory and unfair because Staton's workload was twice that of the other directors due to being assigned to two colleges.

203. Pratt's concern about Staton's performance was discriminatory and unfair because Rehm and Pratt refused to provide Staton with administrative assistance.

204. Pratt's concern about Staton's performance was discriminatory and unfair because Staton had advised Pratt that she had several significant, guaranteed donations coming in a few weeks during CSU's Annual Giving Day.

205. Pratt's concern about Staton's performance was discriminatory, unfair, and premature because the fiscal year was not over until June 30, 2021.

206.    Pratt did not express a concern regarding the performance of any non-African American directors.

207.    Pratt did not express a concern regarding the performance of any director that had not complained about disparate treatment.

208.    Pratt's expression of concern regarding Staton's performance was because of her race.

209.    Pratt's expression of concern regarding Staton's performance was discrimination because of Staton's race.

210.    Pratt's expression of concern regarding Staton's performance was retaliation because of Staton's complaints.

211.    During the January 14th Zoom Meeting, Staton complained that she felt Pratt's premature and unfair criticism of her performance was racially motivated. ("Staton's Second Complaint of Discrimination")

212.    During the January 14th Zoom Meeting, Staton also asked for clarification on her actual goal for the current fiscal year.

213.     During the January 14th Zoom Meeting, Pratt incorrectly stated to Jarrett that Staton's individual goal for the fiscal year was $300,000.

214.    During the January 14th Zoom Meeting, Pratt did not provide the actual goal book so that Staton and Jarrett could view the goal themselves.

215.    During the January 14th Zoom Meeting, Jarrett repeatedly interrupted Staton and would not allow her to respond to Pratt's inaccurate statements regarding Staton's individual goals.

216.    During the January 14th Zoom Meeting, Pratt advised he would discuss the goals in more detail with Staton during their next one-on-one meeting.

217. On or around January 22, 2021, Staton filed a complaint of racial discrimination and retaliation with CSU's Office for Institutional Equity ("OIE"). ("Staton's OIE Complaint")

218. In Staton's OIE Complaint, Staton described the disparate and retaliatory treatment she had been experiencing at CSU, and her fear of being set up to be fired as further retaliation for her complaints.

219. On or around January 29, 2021—less than a week after Staton's OIE Complaint was filed—Defendants placed Staton on a 90-day Performance Improvement Plan ("PIP"). ("Discriminatory and Retaliatory PIP")

220. Defendants were all aware that Staton had filed an OIE Complaint, because the OIE investigator had contacted them for individual responses prior to January 29, 2021.

221. Pratt did not place any Caucasian directors on a PIP.

222. Pratt did not place any directors who had not complained of disparate treatment on a PIP.

223. Pratt placed Staton on a PIP because of her race.

224. Pratt's placing Staton on a PIP was discrimination because of Staton's race.

225. Pratt's placing Staton on a PIP was retaliation for Staton's complaints of racial discrimination and retaliation.

226. Pratt's placing Staton on a PIP was retaliation for Staton's OIE Complaint.

227. In or around February 2021, Staton discovered that Rehm and Pratt had issued new purchase cards to all the other directors for work-related expenses.

228. Staton was the only director that did not receive a new purchase card for work-related expenses.

229. Staton had originally placed a renewal request for a new purchase card on December 2020, along with the other directors.

230.   In or around February 2021, Staton asked Defendants about getting her purchase card.

231.   In or around February 2021, and throughout the remainder of her employment with CSU, Defendants ignored Staton's repeated requests for a purchase card.

232.   Rehm and Pratt did not ignore the request for a purchase card for non-African American directors.

233.   Defendants did not ignore the request for a purchase card for directors that had not complained of racial discrimination and retaliation.

234.   Defendants did not ignore the request for a purchase card for directors that had not filed an OIE Complaint.

235.   Defendants' failure to issue a purchase card to Staton was because of her race.

236.   Defendants' failure to issue a purchase card to Staton was discrimination because of Staton's race.

237.   Defendants' failure to issue a purchase card to Staton was retaliation for Staton's complaints of racial discrimination and retaliation.

238.   Defendants' failure to issue a purchase card to Staton was retaliation for Staton's OIE Complaint.

239.   In or around February 2021, Pratt began criticizing Staton's Development Engagement Plan ("DEP") charts, although he had never taken the time to review them prior to Staton's OIE Complaint. ("Pratt's Sudden Interest in Staton's DEP Charts")

240.   Staton had been submitting a DEP chart to Pratt before every one-on-one meeting, and on numerous occasions, Pratt would admit to Staton that he had not reviewed Staton's DEP chart prior to the meeting.

241. Pratt's Sudden Interest in Staton's DEP Charts was a means for Pratt to look for additional ways to criticize Staton's performance after she filed an OIE Complaint.

242. Pratt's Sudden Interest in Staton's DEP Charts was because of her race.

243. Pratt's Sudden Interest in Staton's DEP Charts was discrimination because of Staton's race.

244. Pratt's Sudden Interest in Staton's DEP Charts was retaliation for Staton's complaints of racial discrimination and retaliation.

245. Pratt's Sudden Interest in Staton's DEP Charts was retaliation for Staton's OIE Complaint.

246. In or around February 2021, Staton met with OIE Investigator, LeJuan Flores regarding Staton's OIE Complaint. ("February 2021 OIE Meeting")

247. During the February 2021 OIE Meeting, Staton amended her OIE complaint to include new complaints of retaliation regarding the purchase card issue and Pratt's Sudden Interest in Staton's DEP Charts.

248. In or around February 2021, Flores advised Staton she had spoken with Rehm, Pratt, and Jarrett regarding Staton's allegations in the OIE Complaint.

249. In or around February 2021, Flores advised Staton that Rehm, Pratt, and Jarrett all stated the Discriminatory and Retaliatory PIP was not to be considered an adverse action but was merely being used as a "tool for improvement."

250.  Defendants did not place any non-African American directors on a PIP as a tool for improvement.

251. Defendants did not place any directors who had not complained of race discrimination and retaliation on a PIP as a tool for improvement.

252. Defendants did not place any directors who had not submitted an OIE complaint on a PIP as a tool for improvement.

**(Defendants Continue Their Campaign of Discrimination and Retaliation Against Staton After the PIP)**

253.    After Defendants placed Staton on a PIP, they systematically began to "move the goalposts" anytime Staton satisfied a component of the PIP.

254.    When Defendants placed Staton on the PIP, Pratt and Jarrett set a dollar goal for Staton to collect $71,250 within the first 30 days. ("Staton's 30-day PIP Goal")

255.    In or around February 2021, Staton collected over $74,000 for CSU's Annual Giving Day campaign, satisfying and exceeding Staton's 30-day PIP Goal. ("Staton's Successful Annual Giving Day Collection")

256.    Staton's 30-day PIP Goal clearly stated that Staton needed to collect $71,250 and at least two major gifts—which are donations of $25,000 or more—with no other stipulations.

257.    Once Pratt discovered Staton had collected $74,000 on Annual Giving Day, Pratt decided to arbitrarily change the parameters of Staton's 30-day PIP Goal.

258.    Instead of counting each and every one of Staton's Annual Giving Day donations, Pratt decided to only count one donation of $35,000 to the School of Nursing towards Staton's 30-Day PIP Goal. ("Pratt's Arbitrary, After-The-Fact Change to Staton's PIP Goals")

259.    Pratt tried to explain his Arbitrary, After-The-Fact Change to Staton's PIP Goals by claiming that only the major gift donations are supposed to count towards Staton's PIP dollar goal.

260.    Staton's 30-Day PIP Goal did not mention any exclusion of donations that were not major gifts.

261.    Pratt's exclusion of Staton's donations that were not major gifts was not common practice in the Advancement Department and it contradicted Staton's job description.

262. At no time before or after the PIP had the Advancement Department only counted major gifts towards any director's goals.

263. All other directors in the apartment were allowed to count any dollar amount collected as a gift that was included in their numbers for the fiscal year.

264. Throughout Staton's employment with CSU, directors in the Advancement Department had been encouraged to collect donations for any amount from all possible sources.

265. Throughout Staton's employment with CSU, directors in the Advancement Department were never told that only major gifts would count towards their individual goals for the fiscal year.

266. A large amount of the dollars collected for each director's individual goals come from sources other than major gifts, and until Pratt's Arbitrary, After-The-Fact Change to Staton's PIP Goals, non-major gifts had never been excluded from any director's numbers.

267. On numerous occasions, Rehm and Pratt praised other directors—who were all Caucasian— for collecting donations that were less than the major gift threshold of $25,000.

268. Rehm and Pratt never communicated in any team meeting with all directors that non-major gifts would not be counted as dollars collected for any other director's individual goals.

269. Pratt chose to exclude Staton's non-major gift donations in order to prevent Staton from meeting her 30-day PIP goal.

270. Pratt's exclusion of Staton's non-major gift donations was because of her race.

271. Pratt's exclusion of Staton's non-major gift donations was discrimination because of Staton's race.

272.     Pratt's exclusion of Staton's non-major gift donations was retaliation for Staton's complaints of racial discrimination and retaliation.

273.     Pratt's exclusion of Staton's non-major gift donations was retaliation for Staton's OIE Complaint.

274.     In or around March 8, 2021, Staton met with Pratt and Jarrett for her 60-Day PIP review. ("Staton's 60-Day PIP Review Meeting")

275.     During Staton's 60-Day PIP Review Meeting, Pratt and Jarrett asked Staton to make some revisions to her latest DEP chart. ("Required DEP Revisions")

276.     During Staton's 60-Day PIP Review Meeting, Pratt and Jarrett repeatedly emphasized how important it was for Staton to make the Required DEP Revisions by the next day.

277.     After Staton's 60-Day PIP Review Meeting, Staton worked diligently that day and late into the evening to make the Required DEP Revisions in order to meet the short deadline.

278.     Staton made the Required DEP Revisions and submitted the revised DEP chart to Pratt and Jarrett by the March 9, 2021 deadline.

279.     On or around March 10, 2021, Staton was scheduled to meet with Pratt for their regularly scheduled one-on-one meeting. ("March 10th Meeting")

280.     During the March 10th Meeting, Staton was prepared to discuss all the Required DEP Revisions she had made, only to discover that Pratt had not bothered to read her revised DEP chart.

281.     Pratt and Jarrett had demanded Staton make the Required DEP Revisions in hopes she would not complete the task on time, giving them a reason to say she had not met her 60-day PIP requirements.

282. Pratt had no intention of reviewing the Required DEP Revisions that Staton had made, and knowingly added to her already-overwhelming workload for no good reason.

283. Pratt and Jarrett did not require any non-African American directors to make Required DEP Revisions in less than 24 hours with no intention of reviewing the revisions.

284. Pratt and Jarrett did not require any directors that had not complained about racial discrimination and retaliation to make Required DEP Revisions in less than 24 hours with no intention of reviewing the revisions.

285. Pratt and Jarrett did not require any directors that had not made an OIE Complaint to make Required DEP Revisions in less than 24 hours with no intention of reviewing the revisions.

286. Pratt and Jarrett did not require any directors that had not made an OIE Complaint to make Required DEP Revisions in less than 24 hours.

287. Defendants' insistence that Staton make futile, last-minute revisions to her DEP chart was because of her race.

288. Defendants' insistence that Staton make futile, last-minute revisions to her DEP chart was discrimination because of Staton's race.

289. Pratt's and Jarrett's insistence that Staton make futile, last-minute revisions to her DEP chart was retaliation because Staton had complained about racial discrimination and retaliation.

290. Defendants' insistence that Staton make futile, last-minute revisions to her DEP chart was retaliation because Staton had made an OIE Complaint.

291. In or around March 2021, Pratt tasked Staton with preparing an elaborate presentation for the visiting committee of the College of Sciences and Health Professions. ("Visiting Committee Presentation")

292.   In or around March 2021, Staton created the Visiting Committee Presentation, which took several days to put together.

293.   Dean Bond oversaw the College of Sciences and Health Professions and had the final decision as to which donors would be contacted for her college.

294.   In or around March 2021, Staton met with Dean Bond to discuss the Visiting Committee Presentation and to get Dean Bond's input.

295.   When Staton met with Dean Bond, Staton learned that a significant number of the donors Pratt wanted Staton to present to were earmarked by Dean Bond for a specific, upcoming project, and Dean Bond did not want them contacted until that pending project had been approved. ("Dean Bond's List of Off-Limit Donors")

296.   When Staton advised Pratt about Dean Bond's List of Off-Limit Donors, Pratt disagreed with Bond's viewpoint on the matter.

297.   Although Bond specifically stated that the donors on the Off-Limit list should not be contacted at the time, Pratt attempted to force Staton to contact the Off-Limit donors anyway.

298.   Pratt's direct opposition to Bond's Off-Limit list put Staton in the middle of an awkward situation.

299.   Pratt's direct opposition to Bond's Off-Limit list put Staton in a position where she would have been forced to continue fundraising for a college where she did not have the dean's support.

300.   Fundraising for a college without the dean's support makes it much more difficult to raise money for the college in question.

301. Pratt's attempt to make Staton fundraise without the Dean's support was another way for Pratt to find fault with Staton's fundraising performance.

302. Pratt did not attempt to force non-African American directors to fundraise without the dean's support.

303. Pratt did not attempt to force directors who had not complained about racial discrimination and retaliation to fundraise without the dean's support.

304. Pratt did not attempt to force directors who had not made an OIE Complaint to fundraise without the dean's support.

305. Pratt's attempt to make Staton fundraise in opposition to Dean Bond's wishes was because of Staton's race.

306. Pratt's attempt to make Staton fundraise in opposition to Dean Bond's wishes was discrimination because of Staton's race.

307. Pratt's attempt to make Staton fundraise in opposition to Dean Bond's wishes was retaliation because of Staton's complaints of racial discrimination and retaliation.

308. Pratt's attempt to make Staton fundraise in opposition to Dean Bond's wishes was retaliation because of Staton's OIE Complaint.

309. On or around March 19, 2021, Pratt emailed Staton, copying Jarrett. ("Pratt's March 19th Email")

310. In Pratt's March 19th Email, Pratt praised Staton's work on the presentation she had prepared for the College of Sciences and Health Professions visiting committee and expressed Pratt's and Jarrett's appreciation for the thought and effort Staton had put into the project.

311.    In Pratt's March 19th Email, Pratt stated that he and Jarrett had finally reviewed Staton's Required DEP Revisions, and they were going to use several aspects from the chart as a major part of an upcoming meeting with Pratt, Rehm, and Bond.

312.    In Pratt's March 19th Email, Pratt did not express that anything was wrong with the revisions Staton had made to the DEP chart.

313.    On or around April 29, 2021, Pratt emailed Staton's 90-day PIP review to Staton and Jarrett. ("Staton's 90-Day PIP Review")

314.    In Staton's 90-Day PIP Review, Staton noted that Pratt had once again left out several of Staton's donations, totaling about $116,000. ("Staton's Missing Donations")

315.    Staton had previously pointed out the Missing Donations in a recent one-on-one meeting with Pratt, but Pratt had failed to adjust Staton's numbers to reflect the correct amount.

316.    On or around April 29, 2021, Staton met with Pratt and Jarrett regarding the 90-Day PIP Review. ("April 29th Meeting")

317.    During the April 29th Meeting, Staton attempted to defend herself by explaining the numbers Pratt was using were incorrect and pointing out that Pratt was still arbitrarily changing department policies and rules in order to exclude a large percentage of Staton's dollars collected.

318.    As in previous meetings with Pratt and Jarrett, Jarrett continued to side with Pratt and refused to listen to anything Staton said, without having looked at the goal book for herself.

319.    During the April 29th Meeting, in addition to addressing the Missing Donations and the continuous changing of rules, Staton also provided Pratt and Jarrett with sufficient proof that she had several more donations coming in that would allow her to surpass her goal well ahead of the June 30, 2021 end of the fiscal year.

320. During the April 29th Meeting, Pratt and Jarrett refused to listen to anything Staton was saying, instead looking for ways to exclude more of Staton's donations.

321. In or around May 2021, Pratt refused to count a $50,000 donation from donor Beth Domholdt for Staton's dollars collected towards her PIP and fiscal year goals. ("Pratt's Discriminatory Exclusion of $50,000")

322. Pratt claimed his Discriminatory Exclusion of $50,000 from Staton's dollars collected was because the donor's gift had not been "strategically planned" and that the donor was under the age of 65. ("Pratt's Fabricated Excuse")

323. Pratt's claim that Staton's $50,000 donation was not strategically planned was patently false because Staton had discussed the strategy she planned to use for Domholdt's call with Pratt.

324. Prior to Staton's and Pratt's call with Domholdt, Staton had also sent notes regarding her planned strategy to Pratt.

325. Pratt never expressed any issue with Dumholdt's age or Staton's strategy for soliciting a donation from Domholdt during Staton's and Pratt's discussion regarding the call with Domholdt.

326. Pratt's Fabricated Excuse for Excluding $50,000 from Staton's dollars collected was contradictory to the customary practice of the Advancement Department.

327. Pratt did not attempt to exclude donations that were not "strategically planned" by any of the Caucasian directors.

328. On several occasions, Pratt and Rehm praised Gibson during meetings for donations that she collected that had been set up before she began her new position at CSU. ("Gibson's Opportunistic Donations")

329. Pratt did not attempt to exclude Gibson's Opportunistic Donations from Gibson's numbers.

330. Pratt did not attempt to exclude Opportunistic Donations from any other Caucasian director when the dollars were collected.

331. Pratt's Discriminatory Exclusion of $50,000 from Staton's dollars collected was another one of Pratt's attempts to prevent Staton from reaching her PIP goals.

332. Pratt's Discriminatory Exclusion of $50,000 from Staton's dollars collected was because of her race.

333. Pratt's Discriminatory Exclusion of $50,000 from Staton's dollars collected was discrimination because of Staton's race.

334. Pratt's Discriminatory Exclusion of $50,000 from Staton's dollars collected was retaliation for Staton's complaints of racial discrimination and retaliation.

335. Pratt's Discriminatory Exclusion of $50,000 from Staton's dollars collected was retaliation for Staton's OIE Complaint.

336. Despite all the discriminatory and retaliatory activity reported above, the OIE investigator released a final report on or around May 27, 2021. ("OIE Final Report")

337. Based on the OIE investigator's failure to consider pertinent information and the likely bias towards CSU's management team, the OIE Final Report concluded there was no evidence of discrimination towards Staton.

338. The OIE Final Report included an April 12, 2021 email conversation between OIE Investigator Flores and Pratt where Pratt confirmed that Staton's PIP had been successful up to that date.

339. The OIE Final Report included an admission from Jarrett that she never looked at Staton's goal book, and just blindly followed whatever she was told by Pratt regarding Staton's numbers.

340. The OIE Final Report included statements from Pratt and Jarrett that Staton's PIP was not supposed to be considered disciplinary in any way.

341. The OIE Final report did not take into account other relevant factors such as the discriminatory and unfair inclusion of various types of donations in the Caucasian directors' numbers that were expressly excluded from Staton's numbers, or the fact these numbers were accrued via established donor pipelines that did not exist in either of the colleges to which Staton was assigned to fundraise.

342. On or around May 27, 2021, Staton had already met and exceeded the goals of the Discriminatory and Retaliatory PIP. ("Staton's Successful Completion of the Discriminatory and Retaliatory PIP")

343. Despite Staton's Successful Completion of the Discriminatory and Retaliatory PIP, Pratt and Jarrett once again "moved the goalposts" by extending Staton's PIP until June 30, 2021. ("Discriminatory and Retaliatory Extension of Staton's Successfully Completed PIP")

344. Defendants' Discriminatory and Retaliatory Extension of Staton's Successfully Completed PIP occurred just about the same time the OIE Final Report was released.

345. Defendants claimed they decided to extend Staton's PIP to keep her "on track" for the next fiscal year.

346. Staton had already met the goals of the PIP and had provided proof of additional donations that would be coming in before the end of the fiscal year.

347.  The Discriminatory and Retaliatory Extension of Staton's Successfully Completed PIP was clearly done in retaliation for Staton's OIE Complaint.

348.  CSU did not unnecessarily extend successfully completed PIPs for Caucasian employees.

349.  CSU did not unnecessarily extend successfully completed PIPs for employees that had not filed complaints of racial discrimination and retaliation.

350.  CSU did not unnecessarily extend successfully completed PIPs for employees that had not filed an OIE Complaint.

351.  Defendants' unnecessary extension of Staton's successfully completed PIP was because of her race.

352.  Defendants' unnecessary extension of Staton's successfully completed PIP was discrimination because of Staton's race.

353.  Defendants' unnecessary extension of Staton's successfully completed PIP was retaliation because Staton had complained about race discrimination and retaliation.

354.  Defendants' unnecessary extension of Staton's successfully completed PIP was retaliation because Staton had filed an OIE Complaint.

355.  Although Pratt and Jarrett felt it was necessary to extend Staton's Discriminatory and Retaliatory PIP until June 30, 2021, Pratt and Jarrett did not feel it was necessary to continue any of the meetings they were previously having with Staton to gauge her progress during the PIP.

356.  Pratt's and Jarrett's failure to continue meeting with Staton was a clear indication there was no valid reason for Staton to remain on a PIP.

357.  Pratt's and Jarrett's decision to extend Staton's PIP was pretextual because there was no valid reason to extend the PIP.

**(CSU Inexplicably Terminates Staton's Employment)**

358.    On or around June 7, 2021, Staton emailed Pratt to request vacation time after receiving an

        email from HR regarding vacation time, reminding everyone to either "use it or lose it".

359.    Pratt was out sick on June 7, 2021, so he did not respond to Staton's vacation request.

360.    On or around June 8, 2021, Pratt sent an email to all directors in the Advancement

        Department, asking them to submit updated DEP charts by June 9, 2021.

361.    Because she had recently been harassed so much by Pratt and Jarret regarding DEP charts,

        Staton completed her DEP chart that day and made sure to turn it in to Pratt by the June 9th

        deadline.

362.    Upon information and belief, Staton was the only director that had complied with the

        request to submit an updated DEP chart.

363.    Upon information and belief, this request for a DEP chart was another attempt by Pratt to

        force Staton to perform an unnecessary task.

364.    On or around June 9, 2021, Pratt called Staton and asked Staton if her DEP chart had been

        submitted because Rehm and Jarrett "wanted to know."

365.    On or around June 9, 2021, Staton had already submitted her DEP chart to Pratt earlier that

        day and he had not seen or reviewed it.

366.    Staton's June 9th DEP chart included details of $375,000 in donor gifts that were secured

        for late June/early July 2021, giving Staton an early jump on her numbers for the next fiscal

        year.

367.    Staton's June 9th DEP chart included details of an additional gift for $1.8 million that a

        donor planned to donate in the upcoming fiscal year.

368.    Staton's June 9th DEP chart included details that showed she was already on track to exceed her goals for the new fiscal year before it ever began.

369.    Staton's June 9th DEP chart included details of several upcoming calls with donors that were planning on securing additional donations in the next few weeks, definitively exceeding Staton's goals for the current fiscal year.

370.    After Pratt's June 9th call to Staton to question her about her DEP chart, Staton contacted several of the other directors in the Advancement Department.

371.    Staton confirmed with the other directors that none of them had bothered to submit the requested DEP chart and none of them had been contacted by Pratt or questioned as to whether they had submitted a DEP chart on June 9, 2021.

372.    At least one other director confirmed that Pratt never discussed her DEP chart during her one-on-one meetings with Pratt, so she never bothered to do a DEP chart.

373.    Staton's discussions with other directors further confirmed that Defendants used the DEP chart as a means to assign Staton additional work in retaliation for her complaints of racial discrimination and retaliation.

374.    On June 11, 2021, Pratt scheduled a Zoom meeting with Staton and Rehm. ("June 11th Meeting")

375.    Staton assumed the reason for the June 11th Meeting was to discuss her request for vacation time.

376.    Staton came to the June 11th Meeting expecting to give details about her DEP chart and to lay out a plan for her prospects and meetings.

377.    During the June 11th Meeting, Defendants told Staton they were terminating her employment.

378.    Defendants terminated Staton's employment on June 11, 2021.

379.    CSU's purported reason for terminating Staton's employment was performance.

380.    CSU's purported reason for terminating Staton's employment contradicts its reason for extending her PIP to "keep her on track" – meaning that she was already on track.

381.    CSU actually terminated Staton's employment because of her race.

382.    CSU actually terminated Staton's employment in retaliation for Staton's complaints about racial discrimination and retaliation.

383.    CSU actually terminated Staton's employment in retaliation for Staton's OIE Complaint.

384.    Upon information and belief, CSU has a progressive discipline policy.

385.    Upon information and belief, CSU uses its progressive discipline policy when it disciplines non-African American employees.

386.    Upon information and belief, CSU uses its progressive discipline policy when it disciplines employees who did not report race discrimination.

387.    CSU violated its own progressive discipline policy when it constructively discharged Staton's employment because of her race.

388.    Alternatively, CSU violated its own progressive discipline policy when it terminated Staton's employment because of her race.

389.    CSU violated its own progressive discipline policy when it constructively discharged Staton's employment because she reported race discrimination.

390.    Alternatively, CSU violated its own progressive discipline policy when it terminated Staton's employment because she reported race discrimination.

391.    CSU violated its own progressive discipline policy when it constructively discharged Staton's employment because she filed an OIE Complaint.

392.  Alternatively, CSU violated its own progressive discipline policy when it terminated Staton's employment because she filed an OIE Complaint.

**(CSU Continues to Retaliate Against Staton After Her Wrongful Termination)**

393.  During the June 11th Meeting, Pratt and Rehm did not provide any numbers or documentation to show where Staton's performance was allegedly unacceptable.

394.  During the June 11th Meeting, Staton was caught off-guard because throughout her PIP, Pratt and Jarrett advised Staton the PIP was not disciplinary and that she was making her numbers.

395.  During the June 11th Meeting, Pratt and Rehm advised Staton to submit her resignation by the end of the day on Monday, June 14, 2021, in lieu of being terminated.

396.  During the June 11th Meeting, Pratt and Rehm advised Staton that she would be "on vacation" status through July 15, 2021, which would then be considered her termination date for administrative purposes.

397.  On or around June 14, 2021, before Staton had a chance to submit her resignation, Pratt and Rehm called a meeting with the Advancement Department and announced Staton had been terminated for performance.

398.  On or around June 14, 2021, Pratt and Rehm announced Staton had been terminated as further retaliation against Staton for her complaints of racial discrimination and retaliation.

399.  On or around June 14, 2021, Staton submitted her forced resignation in lieu of termination.

400.  On or around June 14, 2021, Staton discovered that Pratt and Rehm had updated Staton's email response prompter to indicate that Staton was "no longer with CSU as of June 11, 2021."

401. CSU's use of the inaccurate email response prompter was further retaliation against Staton, used to cast a shadow of disgrace over CSU's termination of Staton's employment.

402. On or around June 15, 2021, Staton emailed CSU's HR department to complain about Pratt's and Rehm's continued retaliatory behavior after they terminated her employment.

403. CSU's HR department never responded to Staton's June 15, 2021 email and Pratt, Jarrett and Rehm were never held accountable for any of their discriminatory and retaliatory actions.

**(Staton Appeals Her Wrongful Termination)**

404. On or around June 16, 2021, Staton appealed her termination through CSU's appeal process.

405. CSU scheduled a post-disciplinary hearing via Zoom for July 16, 2021, to address Staton's appeal.

406. The post-disciplinary hearing was conducted by CSU's Manager of Labor Relations, Danielle Ruiz.

407. During the post-disciplinary hearing, Staton presented all the evidence she had regarding the discrimination and retaliation she had experienced at CSU, including evidence that CSU had wrongfully terminated her employment after she had successfully completed her PIP.

408. Pratt spoke on behalf of CSU in the post-disciplinary hearing and did not provide a single document or any other evidence that justified CSU's termination of Staton's employment "for performance."

409.  As in previous meetings between Pratt and Staton, Pratt never produced a goal book, an accurate attainment report, or any other document that was allegedly used to make the decision to terminate Staton's employment.

410.  Despite Pratt's lack of sufficient evidence to support CSU's actions, Ruiz upheld CSU's decision to terminate Staton's employment.

411.  Although Pratt and CSU had not introduced a single document during Staton's post-disciplinary hearing, Ruiz's post-disciplinary summary report mysteriously included a copy of Staton's PIP as evidence allegedly submitted to support CSU's decision to terminate Staton's employment.

412.  In Ruiz's post-disciplinary summary report, the PIP was now being deemed as key evidence to support Staton's termination despite Rehm's, Jarrett's, and Pratt's previous insistence that the PIP was not intended to be disciplinary.

413.  Ruiz's post-disciplinary summary report also contained a misrepresentation that the deans of the two colleges for which Staton fundraised were aware of CSU's decision to terminate Staton's employment and that both deans agreed with CSU's decision, which was false.

414.  Upon information and belief, neither of the deans of Staton's assigned colleges had been informed of CSU's decision to terminate Staton's employment before it occurred, and neither dean agreed with the decision.

415.  Ruiz's post-disciplinary summary report also inaccurately reported Staton's final numbers, showing that Ruiz had not thoroughly investigated Staton's wrongful termination, but had instead relied on the inaccurate information provided by Pratt, Rehm, and Jarrett.

416.    Ruiz clearly did not bother to verify any information that was provided after the post-disciplinary hearing to allegedly support CSU's decision to terminate Staton's employment.

417.    Ruiz's post-disciplinary summary report is further evidence of Defendants' continued efforts to retaliate against Staton for complaining about the discrimination and retaliation Staton experienced throughout her employment at CSU.

418.    Staton suffered and continues to suffer damages as a result of Defendants' conduct.

**COUNT I: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. 2000e-2 *et seq.***

419.    Staton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

420.    Throughout her employment, Staton was fully competent to perform her essential job duties.

421.    CSU treated Staton differently than other similarly situated employees based on her race.

422.    CSU violated 42 U.S.C. 2000e-2 *et seq.*by discriminating against Staton due to her race.

423.    On or about June 11, 2021, CSU constructively discharged Staton without just cause.

424.    Alternatively, on or about June 11, 2021, CSU terminated Staton's employment without just cause.

425.    At all times material herein, similarly, situated non-African American employees were not constructively discharged without just cause.

426.     Alternatively, at all times material herein, similarly, situated non-African American employees were not terminated without just cause.

427.    CSU constructively discharged Staton based on her race.

428.    Alternatively, CSU terminated Staton's employment based on her race.

429. CSU violated 42 U.S.C. 2000e-2 *et seq*. when it constructively discharged Staton based on her race.

430. Alternatively, CSU violated 42 U.S.C. 2000e-2 *et seq.* when it terminated Staton's employment based on her race.

431. Staton suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to 42 U.S.C. 2000e-2 *et seq*.

432. As a direct and proximate result of Defendants' conduct, Staton has suffered and will continue to suffer damages, including economic damages and emotional distress damages.

**COUNT II: RACE DISCRIMINATION IN VIOLATION OF R.C 4112.01 *et seq.***

433. Staton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

434. Throughout her employment, Staton was fully competent to perform her essential job duties.

435. CSU treated Staton differently than other similarly situated employees based on her race.

436. CSU violated R.C 4112.01 *et seq.* by discriminating against Staton due to her race.

437. On or about June 11, 2021, CSU constructively discharged Staton without just cause.

438. Alternatively, on or about June 11, 2021, CSU terminated Staton's employment without just cause.

439. At all times material herein, similarly, situated non-African American employees were not constructively discharged without just cause.

440. Alternatively, at all times material herein, similarly, situated non-African American employees were not terminated without just cause.

441. CSU constructively discharged Staton based on her race.

442. Alternatively, CSU terminated Staton's employment based on her race.

443.    CSU violated R.C 4112.01 *et seq.* when it constructively discharged Staton based on her race.

444.     Alternatively, CSU violated R.C 4112.01 *et seq.* when it terminated Staton's employment based on her race.

445.    Staton suffered emotional distress as a result of Defendants' conduct and is entitled emotional distress damages pursuant to R.C 4112.01 *et seq.*

446.    As a direct and proximate result of Defendants' conduct, Staton has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT III:  RETALIATORY DISCRIMINATION IN VIOLATION OF 42 U.S.C.A. 2000e-3

447.    Staton restates each and every prior paragraph of this complaint, as if it were fully restated herein.

448.    As a result of Defendants' discriminatory conduct described above, Staton complained to CSU's Office of Inclusion and Equity about the race discrimination she was experiencing.

449.    Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, Staton received negative reviews about her productivity.

450.    Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, CSU placed Staton on a PIP.

451.    Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, Pratt refused to count some of Staton's collected donations towards her annual goals.

452. Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, Pratt and Jarrett repeatedly changed the requirements for Staton's PIP to make her miss her annual goals.

453. Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, CSU constructively discharged Staton.

454. Alternatively, subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, CSU terminated Staton's employment.

455. Defendants' actions were retaliatory in nature based on Staton's opposition to the unlawful discriminatory conduct.

456. Pursuant to 42 U.S.C. 2000e-3 it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

457. Staton suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant 42 U.S.C. 2000e-3

458. As a direct and proximate result of Defendants' retaliatory discrimination against and termination of Staton, she suffered and will continue to suffer damages, including economic damages and emotional distress damages.

### COUNT IV:  RETALIATION IN VIOLATION OF R.C. § 4112.02(I)

459. Staton restates each and every prior paragraph of this complaint, as if it were fully restated herein.

460. As a result of Defendants' discriminatory conduct described above, Staton complained to CSU's Office of Inclusion and Equity about the race discrimination she was experiencing.

461. Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, Staton received negative reviews about her productivity.

462.   Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, CSU placed Staton on a PIP.

463.   Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, Pratt refused to count some of Staton's collected donations towards her annual goals.

464.   Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, Pratt and Jarrett repeatedly changed the requirements for Staton's PIP to make her miss her annual goals.

465.   Subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, CSU constructively discharged Staton.

466.   Alternatively, subsequent to Staton's reporting of race discrimination to CSU's Office of Inclusion and Equity, CSU terminated Staton's employment.

467.   Defendants' actions were retaliatory in nature based on Staton's opposition to the unlawful discriminatory conduct.

468.   Pursuant to R.C. §4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

469.   Staton suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

470.   As a direct and proximate result of Defendants' retaliatory discrimination against and termination of Staton, she suffered and will continue to suffer damages, including economic damages and emotional distress damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Saunjula Staton respectfully requests relief against Defendants as set forth below:

(a) Issue an order requiring CSU to restore Ms. Staton to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Staton for compensatory damages, non-compensatory damages, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Ms. Staton's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ *Brian D. Spitz*

Brian D. Spitz (0068816)
Sheila Degraffinried (0101692)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
25825 Science Park Drive, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: brian.spitz@spitzlawfirm.com
          sheila.degraffinried@spitzlawfirm.com

*Attorneys For Plaintiff Saunjula Staton*

## **<u>JURY DEMAND</u>**

Plaintiff Saunjula Staton demands a trial by jury by the maximum number of jurors permitted.


/s/ *Brian D. Spitz*
Brian D. Spitz (0068816)
**SPITZ, THE EMPLOYEE'S LAW FIRM**